IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Walsh Construction Company II, LLC,                    Case No. 3:14 CV 2096

                          Plaintiff,                    MEMORANDUM OPINION AND
                                             ORDER DENYING CLAIM FOR
           -vs-                    <u>PERMANENT INJUNCTIVE RELIEF</u>

City of Toledo,                    JUDGE JACK ZOUHARY

                          Defendant,

           -and-

Kokosing Construction Company, Inc.,

                          Defendant/Intervenor
                          Crossclaimant.

### INTRODUCTION

The City of Toledo ("City") has long struggled with sewer overflows. Portions of the City's sewer system collect both stormwater and wastewater from homes and businesses. Because of heavy rains, these combined sewers periodically overflow, threatening human health and the region's ecosystem.

In 2002, the City and the U.S. Environmental Protection Agency entered into a 20-year consent decree, addressing in part the sewer overflow discharges. *See United States v. City of Toledo*, 3:91-cv-7646-JGC (N.D. Ohio 2002). The City subsequently established the Toledo Waterways Initiative ("TWI"), an estimated $521 million investment in regional infrastructure to "prevent 80% of the average overflow volume from getting into [area] waterways." *See* Toledo Waterways

Initiative, *Making our Rivers Cleaner*, http://www.toledowaterwaysinitiative.com (last accessed Oct. 8, 2014).

This lawsuit concerns a significant phase of the TWI and the City's efforts to meet a fast-approaching consent decree deadline.  By January 1, 2015, the City must begin construction of the Ottawa River Storage Facility ("ORSF"), a retention basin for sewer overflows slated for construction on the site of a former brick factory and landfill.  A private firm will complete construction, subject to the City's direction.

Because of the project's anticipated complexity, the City pre-qualified five of eight potential bidders in June 2014.  In July 2014, the City issued the bid opportunity.  By the close of bidding on August 26, four construction firms submitted sealed bids.  Plaintiff Walsh Construction Co. II, LLC ("Walsh") bid $68,743,000, beating out Intervening Defendant and Crossclaimant Kokosing Construction Co., Inc.'s ("Kokosing") $68,977,000 bid -- a $234,000 difference (CX 1).  In percentage terms, Walsh's bid was 0.33 percent lower than Kokosing's.

Despite Walsh's "low" bid, less than two weeks later the City declared Kokosing the bid winner.  Walsh claims the City's award was arbitrary and capricious and an abuse of discretion.  As discussed in more detail below, City officials led Walsh to believe that its bid was satisfactory, but at the last minute City officials reversed course, rejected Walsh's bid as non-responsive, and awarded the project to Kokosing.

Walsh brought this lawsuit seeking injunctive relief "restraining [the City] from awarding the contract for the [ORSF] Project to Kokosing, and directing [the City] to award the contract to Walsh" (Doc. 1 at 8).  Kokosing's crossclaims seek a declaratory judgment that Walsh's bid was "unresponsive and the City acted properly in rejecting it," as well as a writ of mandamus compelling the City to award the contract to Kokosing (Doc. 21 at 5–6).

2

Given the tight deadlines for funding faced by the City, this Court gave expedited consideration to Walsh and Kokosing's claims. By stipulation of Walsh and the City (entered prior to Kokosing's intervention), this Court converted Walsh's Motion for Preliminary Injunctive Relief into a request for final judgment, determining whether Walsh is entitled to a permanent injunction (Doc. 9). This Court held a bench trial on the merits over three days -- September 30, October 1, and October 3 -- receiving exhibits and the testimony of four witnesses. This Memorandum Opinion now follows.

### BACKGROUND

**The Parties and Principal Actors**

Events leading up to the contract award involved a number of individuals, government agencies, and private firms. Walsh and Kokosing are both large construction firms, each sophisticated enough to bid on a project estimated by the Engineer to cost almost $80 million (PX 16). At Walsh, Matthew Glaz served as Lead Project Director, working with Program Manager Bo Boulier and other Walsh employees to prepare Walsh's bid, and to communicate with the City and its consultants in the post-bid period.

Acting Director of Public Utilities Don Moline is the senior City official responsible for administering the ORSF bid. Julie Cousino, the City's TWI Program Administrator, is the most knowledgeable City employee on ORSF matters. Paul Bockstahler, who did not testify, is a City staff engineer.

Because the ORSF contract exceeds $100,000, the Department of Public Utilities ("DPU") does not select the bid winner. Instead, Moline, Cousino, and other DPU employees "submit[] a recommendation award letter" to a multi-member Board of Awards ("Board"), along with "all pertinent documentation relevant to the pending contract . . . . The Board . . . review[s] the matter and

3

make[s] a recommendation to the Mayor indicating the best bid meeting specifications." The Mayor then must award the contract "to the lowest and best bidder based on the recommendation of the Board" (Doc. 14-1 at 2 (City of Toledo, Administrative Policy and Procedure #6)). The Board meets Friday mornings to review agency recommendations.

At least two private consulting firms assisted the City in letting the ORSF Project. Black & Veech ("B&V") is lead consultant for the TWI, and "oversight engineer" for the ORSF Project. Bob Harbron is director of B&V's TWI team, and Jim Broz is his deputy. B&V hired Arcadis to design the ORSF Project and write relevant technical specifications that would serve as a basis for bids. Tim Harmsen is program director for Arcadis' ORSF team.

**The Bid Documents**

The Board's bid award turned on whether Walsh and Kokosing complied with a technical specification that reads (PX 1 at 2) (emphases added) ("Section 02220 1.4(D)"):

> Disposal of material classified as debris will be paid for at the price included in the Contract.
> > 1. The Contingency Bid Price shall include all costs for disposal of 30,000 cu. yds. of material classified as *debris* which is not suitable to be re-used as fill materials, at an *approved sanitary landfill* as directed by the Engineer . . . .

Though styled a "contingency" bid item, all parties knew some amount of offsite disposal of material not suitable for re-use as fill would occur on the project (Cousino Test. (Day 1) at 1:10; PX 24). The bid documents further define "debris" as (PX 1 at 5):

> Excavated materials containing more than 5 percent deleteroius [sic] matter including: brick, cement block, mortar, clay tile, glass bottles, plastic, porcelain, metal, foam, and any other building materials with the exception of materials which meet the definition of Hazardous Environmental Conditions as defined in the General Conditions; and greater than 3 inches in any dimension.

4

> Debris that is removed from the stockpiled fill materials and that cannot be re-used in lesser quality fill materials shall be disposed of off Site at an approved sanitary landfill in accordance with Laws and Regulations at the Contingency Bid Unit Price for Debris Disposal.

No bid document further defines "approved sanitary landfill."

Each bidder quoted the ORSF Project by relying on certain "technical data," including a Geotechnical Report (Cousino Test. (Day 1) at 1:25). While bidders "may rely upon the general accuracy" of such data, the technical data "are not Contract Documents" (CX 4 at 1), and bidders rely on the technical data at their own risk (*see* Cousino Test. (Day 1) at 1:26). *See also* PX 27 (identifying various soil reports "upon which Contractor may rely" as "technical data"). Relevant here, technical data informed bidders that the ORSF site included (1) a demolished brick factory, and (2) a closed landfill (PX 7).

By submitting a bid for the ORSF Project, each bidder agreed to assume certain responsibilities in connection with bid preparation and submission. The bidders stated they had "[e]xamine[d] and carefully stud[ied] the Bidding Documents, including any Addenda and other related data identified in the Bidding Documents" (CX 2 at 1). The bidders agreed to "[p]romptly give Engineer written notice of all conflicts, errors, ambiguities, or discrepancies that Bidder discovers in the Bidding Documents and confirm that the written resolution thereof is acceptable to Bidder"; the bidders "convey[ed an] understanding of all terms and conditions for the performance of the Work"; and that "[s]ubmission of a Bid . . . constitue[s] an incontrovertible representation by Bidder that Bidder has complied with every requirement concerning examination of the Bidding Documents and the Site," that the bid is tailored to the ORSF Project, and that the "Bidder has given Engineer written notice" of any ambiguities in the Bid Documents (CX 2 at 2).

Bid Documents could have been amended through an addendum process.  Before bid submission, bidders could access the "Plan Bid System" to submit questions to City or consultant engineers, who would then answer the bidder's question.  If the question was deemed sufficiently important, the City's answer could be the basis for a contract addendum (Harmsen Test. at 10:09).  In fact, three addenda were issued during the pre-bid period, though on matters not relevant to this lawsuit (CX 1 (Bid Tabulation Sheet showing "Addendum 1, 2 & 3"); Harmsen Test. at 10:09).

### The City Unseals the Bids, Holds Post-Bid Meetings, Solicits the First Confirmation Letter, and the Consultants Recommend Walsh

On August 26, Walsh, Kokosing, and two other construction firms submitted bids for the ORSF Project and the City unsealed the bids.  The City prepared a bid tabulation sheet (CX 1), reflecting each bidder's base bid (or "contract work" price), as well as all "contingency bid items."  Kokosing's base bid was some $700,000 less than Walsh's, but Walsh committed to providing work on all contingency bid items for only $584,655 to Kokosing's $1,542,500.

Walsh and Kokosing's contingency bid item pricing was more or less the same on six of seven contingency bid items -- any disparities in these six bid items were negligible, in light of their $67 million base bids.  But one contingency bid item stood out: debris disposal.  Walsh committed to disposing of debris at $15 per cubic yard, or $450,000 based on the assumption that 30,000 tons of debris (roughly one-tenth of the 300,000 cubic yards of material that the City anticipates will be excavated) would not be suitable for re-use as fill and would require offsite disposal.  Kokosing committed to perform the same work at $44 per cubic yard, or $1,320,000.  The other bidders each submitted debris disposal bids similar to Kokosing's, at $40 and $46.10 per cubic yard (CX 1).

On Friday, August 29, City, B&V, and Arcadis officials separately met with Walsh and Kokosing representatives to obtain clarifications on each firm's bid.  Broz took notes at the Walsh meeting.  He wrote (PX 11 at 1):

6

> Walsh believes there is a significant amount of debris on site and think it will exceed 30K yards.  When questioned about the location for Debris Disposal, they refused to indicate the dump site that they had considered in their bid or if the $15.00/CY unit price fully covered the "tipping" fee for this debris.  However, they stated they would honor their bid price of $15.00/CY even if the final quantity was as high as 60,000 CY, unless the material was considered to be contaminated . . . .

Because Kokosing also did not name its debris disposal site, that same day Broz separately e-mailed Walsh (PX 12 at 1) and Kokosing (PX 28 at 2), asking each firm to identify the name and location for the "debris disposal site" selected by the firm to satisfy Section 02220 1.4(D), and to provide documents identifying the site's tipping fee and any "other cost information associated with development of the Unit Price Bid."

Walsh responded to consultant B&V on Tuesday, September 2, identifying JEHM Enterprises ("JEHM"), and included a quote that JEHM would charge $6.35 per cubic yard of "construction debris," and that other costs (*e.g*., transit costs, profit, and bond insurance) would yield a total of $15.04 per cubic yard (the "first letter") (PX 12).  Walsh did not disclose an August 26 disposal commitment from the Riverview Land Preserve ("Riverview") (PX 9), a site licensed by the State of Michigan to accept solid waste (PX 24 at 2).  Kokosing separately responded to B&V on the same day, identifying the Vienna Junction Landfill ("Vienna"), explaining the $44 per cubic yard unit price and attaching confirmation from Vienna (PX 28).

Harmsen, on behalf of Arcadis, contacted JEHM directly to confirm Walsh's pricing. Harmsen noted that JEHM is an "aggressive price" and has "130 [to] 140 [feet] vertically over 50 acres to fill."  The JEHM representative "seemed honest/straightforward w/ answers" (PX 13). Having confirmed Walsh's debris disposal pricing, Arcadis recommended to B&V that Walsh be awarded the contract.  B&V, "in complete concurrence," forwarded Arcadis' recommendation to Cousino (PX 14).

7

**The Board Meets on Friday, September 5 and Cousino Solicits a Second Confirmation Letter**

On Wednesday, September 3, Cousino submitted DPU's ORSF award recommendation as an agenda item for the Friday Board meeting (PX 15).  DPU had adopted the consultant's recommendation, urging the Board to award the ORSF Project to Walsh (PX 16 (DPU Bid Recommendation)). The next day, Broz called Cousino, who recorded the substance of that conversation in detailed notes (PX 17).  For the first time, Broz brought to Cousino's attention a possible "problem" with the Bid Documents.

Broz explained "there is [a] difference in terms between [Michigan and Ohio] regarding what type of material [specified landfills] accept."  Municipal solid waste, which could be excavated from the landfill known to exist at the ORSF site, "needs to go to a 'sanitary' landfill in Ohio."  However, the Geotechnical Report (PX 7 & 27 at 1) indicates that the City also could expect to uncover a different type of material, "construction debris," which must be disposed of at a "construction debris landfill."  Broz felt Section 02220 1.4(D) should have specified a "construction debris landfill." Cousino's notes do not reflect whether Broz meant to state that Section 02220 1.4(D) should have specified *only* a "construction debris landfill," or that it should have specified such a landfill *in addition to* the "approved sanitary landfill" identified in the specifications.   Broz explained Kokosing's identified landfill, Vienna, "meets specification for both sanitary and construction debris." He was "not sure if [JEHM] submitted by Walsh" also accepted both types of materials (PX 17).

On Friday, September 5, Cousino and her colleagues presented to the Board DPU's recommendation that Walsh be awarded the contract.  Cousino shared the prior efforts confirming the Walsh price, but the Board deferred its decision.  According to Cousino, the Board was concerned about the large variance in pricing for debris disposal between, on the one hand, Walsh, and on other hand, the three other bidders (Cousino Test. (Day 1) at 1:03).  Cousino also referenced "some

8

concern" on the Board's part regarding relations between B&V and Walsh on an unrelated Michigan job (Cousino Test. (Day 1) at 1:06), but no party further developed that issue.  The Board agreed to hold a special session on Monday morning, September 8 (Cousino Test. (Day 1) at 1:04)

In the meantime, Cousino and Moline agreed it would be a "good idea" to obtain from Walsh a second letter, confirming Walsh's commitment to its low unit price.  On returning to her office that Friday, Cousino contacted Walsh employees, conveying the Board's concerns (Cousino Test. (Day 1) at 1:07).  Bouiler responded that afternoon, attaching to an e-mail a "debris disposal letter requested by the City" (the "second letter"), and asking Cousino to review "and let me know if this is sufficient or you need anything else addressed" (PX 18 at 1).

Walsh's second letter confirmed the $15 per cubic yard quote "at the landfill identified in our September 2, 2014 correspondence," *i.e.*, JEHM.  The letter also cited to portions of the Geotechnical Report, explaining the consultants' expectations of how excavated material of varying types would be handled.  The cited sections refer only to off-site disposal of construction debris (*id*. at 2).  Cousino responded that the "attached disposal letter is sufficient" (*id*. at 1), and then forwarded Walsh's second letter to senior City employees (*id*. a 4).

Then, on Monday morning, September 8, Cousino e-mailed DPU employees, explaining that, based on the JEHM-backed quote, Walsh was the apparent low bidder, even when considering the base bids, the debris disposal contingency, and no other contingency items (PX 19 (explaining Walsh yielded a $146,155 savings over Kokosing when adding only the debris disposal contingency bid item to the base bid)).

### City Employees Reverse Their Recommendation and the Board Selects Kokosing

Shortly before the Board's September 8 10:00 AM special session, DPU expected to affirm its earlier award recommendation.  At roughly 9:00 AM, B&V Program Director Harbon called

Cousino to convey new information developed over the weekend, after Cousino left work on Friday. On Friday, September 5 at 6:30 PM, Harmsen spoke with Arcadis' Cincinnati-based landfill expert, who revealed for the first time that "sanitary landfill" is not, as the consultants previously believed, a "generic term for an engineered landfill."  Rather, the term takes on special meaning in Ohio (PX 20).

According to Arcadis' landfill expert, "sanitary landfill" should bear the meaning identified in the Ohio Administrative Code:

> 'Sanitary landfill facility' means an engineered facility where the final deposition of *solid waste* on or into the ground is practiced . . . and includes the units within the limits of waste placement, all ground water monitoring and control system structures, buildings, explosive gas monitoring, control, and extraction system structures, surface water run-on and runoff control structures, sedimentation ponds, liner systems, and leachate management system structures. The sanitary landfill facility includes all portions of the facility described above and those areas within three hundred feet of the limits of waste placement unless an alternate setback is deemed acceptable by the director . . . .

OHIO ADMIN. CODE § 3745-27-01(S)(4) (emphasis added).  In the same section, the Code defines "solid waste" as:

> such unwanted residual solid or semisolid material, including but not limited to garbage, scrap tires, combustible and noncombustible material, street dirt and debris, as results from industrial, commercial, agricultural, and community operations, *excluding earth or material from construction, mining, or demolition operations*, or other waste materials of the type that normally would be included in demolition debris, nontoxic fly ash and bottom ash, including at least ash that results from combustion of coal, biomass fuels, and ash that results from the combustion of coal in combination with scrap tires where scrap tires comprise not more than fifty per cent of heat input in any month, spent nontoxic foundry sand, and slag and other substances that are not harmful or inimical to public health, and includes but is not limited to garbage, scrap tires, combustible and noncombustible material, street dirt, and debris. Solid waste does not include any material that is an infectious waste or a hazardous waste.

OHIO ADMIN. CODE § 3745-27-01(S)(24) (emphasis added).

Harbron told Cousino the "intention was to have a construction debris landfill" included in the specification.  Harbron went on to explain that the landfill identified by Kokosing allowed for

disposal of both solid waste and construction debris, as Vienna is "associated [with] or part of another landfill that accepts construction debris" (PX 20). Kokosing's contact at Vienna quoted prices for both municipal solid waste and construction and demolition materials (PX 28 at 3). But Harbron was not sure whether this new information, learned from Arcadis's landfill expert, would change B&V's award recommendation (PX 20). He asked to speak with Cousino later in the day on that point, but Cousino told Harbron "I don't have time. I have to let you go" because it was then around 9:20 AM and the Board would meet within the hour (Cousino Test. (Day 1) at 1:14).

Cousino then called her supervisor, Ed Moore, who told her to call Moline after Moore had a chance to walk to Moline's office. Cousino spoke with Moline and Moore, relaying the information she had learned from Harbron. Moline stated he needed to hold a conference call with the City Law Department to determine whether DPU's award recommendation should change. Cousino was not a party to that conference call, which ended with a determination that the Walsh bid was not responsive, and therefore could not be recommended to the Board (Cousino Test. (Day 1) at 1:14 – :15).

Moline explained the abrupt shift in the City's decision. Walsh lost the DPU recommendation because Walsh failed to submit, under the debris disposal contingency bid item, a "sanitary landfill" as that term is defined by the Ohio Administrative Code. "We are digging up an old site and the geotechnical report says there's a landfill on this site. They don't know the extent of the landfill but they've allotted for up to ten percent of the material in that site to go to a sanitary landfill" (Moline Test. at 9:16–9:17). Proper disposal of material excavated from the on-site landfill was "extremely important" to the City. Moline had been "a lead on dealing with" improper disposal of City-owned materials at other area disposal sites. "We spent millions and millions cleaning up prior messes where land fill material was inappropriately disposed." Here, too, the City would "own" landfill materials

11

uncovered at the ORSF site, even when deposited offsite at a landfill (Moline Test. at 9:17 – :18). Because JEHM was not a state-licensed sanitary landfill capable of accepting municipal solid waste, DPU deemed the Walsh bid non-responsive.

At roughly 9:35 AM, fifteen minutes after Cousino called Moore, Moline called Cousino. Moline told Cousino the Walsh bid had been deemed non-responsive. Cousino then called Bockstahler at the Bayview Wastewater Treatment Plant. Bockstahler's signature would appear on the DPU award recommendation letter. Cousino informed Bockstahler he needed to bring with him to the Board meeting a letter recommending Kokosing, not Walsh (Cousino Test. (Day 1) at 1:17). Bockstahler's revised award recommendation letter informed the Board that Walsh, recommended by Bockstahler in the September 3 award recommendation letter (*see* PX 16), had been deemed non-responsive "because it did not meet the requirements of Section 02220 (Excavating and Filling)" (PX 21). Cousino relayed the same information to the Board (Cousino Test. (Day 1) at 1:19), and the Board accepted DPU's recommendation, awarding Kokosing the ORSF Project.

The City did not contact Walsh at any point after learning of the state-law definition of "sanitary landfill." Cousino returned to her office after the Board meeting to a voicemail from Boulier, inquiring on contract status. She referred Boulier to the City's Commissioner of Purchasing (Cousino Test. (Day 1) at 1:27).

It is not clear from the record when Walsh learned why it had not been awarded the contract. But during the afternoon of September 10, Glaz, as lead project director, e-mailed City officials, explaining that "[d]epending on the nature of the debris laden soil, Walsh intends to utilize both" JEHM and Riverview as disposal sites (PX 23 at 3–6). Walsh never before disclosed its Riverview commitment and quote to the City. Walsh's General Counsel forwarded Glaz's e-mail to the City Law Director, explaining that "[h]ad we been made aware of the City's concerns about a licensed

sanitary landfill disposal site earlier," Walsh would have revealed the Riverview commitment and quote at that time.  Walsh's General Counsel stated "this information was not required at bid time," and he failed to see how the information "has any bearing on the City's bid evaluation process" (*id.*).  Subsequent e-mail correspondence between Walsh, the City, and the City's consultants show Riverview otherwise met the technical specifications' "approved sanitary landfill" requirement (PX 25).

But, in the City's words, that information was "too little, too late."  On September 10, the City transmitted Kokosing's name to its state funding agency for financing approval prior to an anticipated December 2014 final approval by the Mayor.

### DISCUSSION

Walsh's claim for permanent injunctive relief requires clear and convincing evidence that the City acted arbitrarily or capriciously, or otherwise abused its discretion, by awarding the ORSF contract to Kokosing.  *Kokosing Constr. Co. v. Dixon*, 72 Ohio App. 3d 320, 326 (1991).  Generally, "[c]lear and convincing evidence is that measure or degree of proof . . . which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Lansdowne v. Beacon Journal Pub. Co.*, 32 Ohio St. 3d 176, 180–81 (1987) (quotation marks omitted).  Walsh's "right [to injunctive relief] must be clear and established by the strength of [Walsh's] own case and not by the weakness of the [City's] case." *Cleveland Constr. Inc. v. Ohio Dep't of Admin. Servs.*, 121 Ohio App. 3d 372, 383 (1997).

As the parties recognize, "abuse of discretion" and "arbitrary and capricious" are vague terms. On the one hand, "[t]he exercise of an honest judgment, however erroneous it may seem to be, is not an abuse of discretion." *State ex rel. Shafer v. Ohio Turnpike Comm'n*, 159 Ohio St. 581, 590 (1953) (quotation marks and emphasis omitted).  Nor, for example, would a public entity's "predisposition"

13

to reject a firm's bid constitute an abuse of discretion. *Danis Clarkco Landfill Co. v. Clark County Solid Waste Mgmt. Dist.*, 73 Ohio St. 3d 590, 605 (1995). The wide discretion vested in the public authority is not abused when the public authority exercises "will, judgment, or reason" in making its award. *State ex rel. Assoc. Builders & Contrs. of Cent. Ohio v. Franklin Cty. Bd. of Comm'rs.*, 125 Ohio St. 3d 112, 118 (2010).

However, the City's discretion is not limitless. "Abuse of discretion" "implies an unreasonable, arbitrary or unconscionable attitude" by the City, while "'arbitrary' means without adequate determining principle" and "'unreasonable' means irrational." *City of Dayton ex rel. Scandrick v. McGee*, 67 Ohio St. 2d 356, 359 (1981) (quotation marks omitted). The City would abuse its discretion or act arbitrarily or capriciously if (for instance) it rejected Walsh's bid on the basis of unannounced criteria, *see, e.g., Ohio Asphalt Paving, Inc. v. Bd. of Comm'rs of Coshocton County,* 2005 WL 1421952, at *5 (S.D. Ohio 2005), or acted fraudulently or in bad faith during the award process, *see, e.g.*, *State ex rel. Executone of Nw. Ohio, Inc. v. Comm'rs of Lucas County*, 12 Ohio St. 3d 60, 61 (1984).

"Particular caution should be exercised in granting injunctions, especially in cases affecting a public interest where the court is asked to interfere with or suspend the operation of important works or to control the action of another department of government." *Leaseway Distrib. Ctrs., Inc. v. Dep't of Admin. Servs.*, 49 Ohio App. 3d 99, 106 (1988). This Court's decision to grant or deny Walsh's request for permanent injunctive relief requires this Court to consider certain equities, a balancing act that (like the City's award decision) also is reviewed for an abuse of discretion. *Danis Clarkco Landfill Co.*, 73 Ohio St. 3d at 591 (syllabus).

**The City Did Not Abuse its Discretion in Finding Walsh's Bid Non-Responsive**

The parties agree that Walsh's claim turns on whether the City abused its discretion in finding Walsh's bid non-responsive to the debris disposal requirement.  "[B]ids for public contracts must conform in all material respects to the contract specifications.  Not every deviation from the specifications will, however, constitute a deviation that renders the bid nonresponsive.  So long as a bid complies with the specifications in all material respects, and contains no irregularities which give one bidder a competitive advantage over others, the bid will be deemed responsive, notwithstanding the omission of an item called for by the specifications." *BFI Waste Sys. of Ohio v. Garfield Hts.*, 94 Ohio App. 3d 62, 72 (1994) (quotation marks omitted).  A "substantial" deviation from a specification gives a bidder a competitive advantage over another bidder.  *See Wilson Bennett, Inc. v. Greater Cleveland Reg'l Transit Auth.*, 67 Ohio App. 3d 812, 819 (1990) ("[T]o be substantial, [the deviation from a bid specification] must affect the amount of the bid and must give the bidder an advantage or benefit not allowed to other bidders.").  Therefore, Walsh's challenge requires this Court to determine whether Walsh has produced clear and convincing evidence that (1) the City abused its discretion in determining what the debris disposal requirement entailed, or (2) that Walsh's use of a construction debris landfill gave Walsh an advantage over other bidders.

*Walsh has not Established by Clear and Convincing Evidence that the City Abused its Discretion in Interpreting the Debris Disposal Requirement*

Walsh asserts that for four months "everyone" knew what the Bid Documents required in the way of debris disposal.  Section 02220 1.4(D) defines "debris" to include various "building materials."  The consultants crafted that definition because the Geotechnical Report shows the ORSF site once was home to a brick factory.  The consultants expected demolition of that brick factory would have left behind building materials.  In Walsh's view, the Bid Documents' reference to an "approved sanitary landfill" must use that phrase in its generic sense -- an engineered landfill --

15

because the state-law definition of a "sanitary landfill facility" refers to a facility that accepts only solid waste.  Walsh based its debris disposal unit price on a commitment it had obtained from a construction debris landfill, and therefore felt its bid was responsive.

The City exercised "will, judgment, or reason" in evaluating the Walsh and Kokosing bids' responsiveness.  Walsh fails to produce clear and convincing evidence that those determinations constitute an abuse of discretion.

Walsh relies on the Geotechnical Report to give meaning to the debris disposal technical specification.  But Walsh ignores another finding of that Report.  The Geotechnical Report advised the bidders (PX 7 at 2–3):

> The historical development of the site appears to date back to 1905 when The Collingwood Brick Company occupied the southerly portion of the site.  The brick manufacturing plant was subsequently demolished, and reportedly the construction demolition debris was buried on site.  The site eventually was listed as a landfill, although the depth of landfill or construction debris fill does not appear to be well documented.  By the 1950's, the site had been developed as a park.  Eventually known as Joe E. Brown Park, research indicates the site was identified in the 1990's in the Lucas County Contaminated Sites Directory, although an August 1993 Ohio EPA assessment found 'no substantial basis to indicate any immediate threatening environmental conditions' and the documentation of the landfill concerns since that time appears to be dormant.  From our review of the data, it is not clear to what areal extent and depth landfill activities actually occurred, nor exactly what was the nature or possible impact of these activities.

The City deemed the presence of landfill materials at the ORSF site an "extremely important" factor affecting debris disposal requirements.  Moline recounted how the City's past history of improper disposal efforts had cost it "millions" of dollars in post-disposal clean-up of materials the City would "own" even when in storage at a landfill.  Some excavated materials would count as "solid waste," which all parties agree must be disposed of at a "sanitary landfill facility."  Walsh's reading of the debris disposal requirement would provide an appropriate disposal site for only one portion of the anticipated onsite debris (*i.e.*, the buried remains of the brick factory), but not another type of

16

debris (*i.e.*, the closed landfill's contents).  And Walsh has not established that a sanitary landfill cannot accept construction debris.  Such a landfill accepts solid waste, defined to exclude construction debris, but without other evidence it does not follow that a sanitary landfill *only* may accept solid waste.

Moreover, the technical specification's "debris" definition could reasonably be read to include solid waste.  The "debris" that must be deposited at an "approved sanitary landfill in accordance with Laws and Regulations" is "excavated materials containing more than 5 percent deleteroius [sic] matter . . . greater than 3 inches in any dimension."  The debris definition includes a listing of the sort of "deleteroius matter" included in the term "debris," and most of those listed materials likely relate to the demolished and buried brick factory.  But Ohio courts generally construe the term "'including" [to] impl[y] that that which follows is a partial, not an exhaustive listing of all that is subsumed within the stated category.  'Including' is a word of expansion rather than one of limitation or restriction." *In re Hartman*, 2 Ohio St. 3d 154, 156 (1983).  This illustrative listing includes (1) materials, like plastic, that could come from either the buried remnants of the brick factory or the closed landfill, and (2) materials, like glass bottles, that are not construction materials.  This Court cannot say the City's view of the debris disposal specification is "irrational."

Nor has Walsh produced clear and convincing evidence that the City abused its discretion by pressing forward with the award, rather than delaying the September 8 Board meeting and following up with Walsh and Kokosing.  By submitting its bid, Walsh represented to the City that there were no ambiguities in the Bid Documents, and that its bid was Walsh's final and complete proposal for the job.  The City reasonably could conclude that the final and complete proposal was based on the use of JEHM as a disposal site.  Post-bid, the City engaged in an even-handed bid clarification process, asking the same questions of Walsh and Kokosing.  Kokosing revealed commitments from

a landfill site that would accept both solid waste and construction debris.[1]  Walsh offered only a site that would accept construction debris.  The City reasonably relied on the parties' submissions in making its decision, even if that decision was unnecessarily rushed and perhaps erroneous in retrospect.

### Walsh has not established by Clear and Convincing Evidence that the City Abused its Discretion by Rejecting Walsh's Bid on the Basis of Unannounced Criteria

Relatedly, Walsh argues the City abused its discretion by rejecting the Walsh bid on the basis of "unannounced criteria."  A contracting authority's use of unannounced criteria to reject an otherwise responsive bid can be an abuse of discretion.  *See Ohio Asphalt Paving, Inc.*, 2005 WL 1421952, at *5.  But, unannounced criteria do not arise whenever parties reasonably disagree as to the meaning or application of Bid Document language.  "The discretion of [a contracting authority] can only be exercised with respect to such matters as could in reason be anticipated as included in the specifications."  *State ex rel. Sceffler v. Griswold*, 35 Ohio App. 354, 360 (1930) (cited in *Kokosing Constr. Co.*, 72 Ohio App. 3d at 326).  Based on the Geotechnical Report and the reference to an "approved sanitary landfill," a sophisticated construction firm like Walsh could at least anticipate that

---

[1]

The parties disputed in passing whether Vienna meets the debris disposal requirement.  Walsh fails to present convincing evidence that it does not.  Nothing in the technical specifications requires the "approved sanitary landfill" to be an Ohio-licensed landfill (indeed, Riverview is not such a facility (PX 24 at 2)).  Vienna is licensed to accept "solid waste" at landfill locations north of the Ohio-Michigan border (*see* PX 29 at 1–2, 9).  Walsh has not shown Michigan's "solid waste" definition materially differs from Ohio's definition of the same term.  *Compare* OHIO ADMIN. CODE § 3745-27-01(S)(24), *with* MICH. COMP. LAWS § 324.11506.  Moreover, Vienna's Michigan license shows an "Ohio Construction and Debris" landfill, "Regulated by Ohio EPA," just across the Ohio-Michigan Border and contiguous to the Michigan portions of the Vienna site.  Kokosing obtained commitments from Vienna for disposal of both solid waste and construction debris (PX 28), and B&V subsequently confirmed that the Michigan portions of the Vienna landfill which accept solid waste are "associated [with] or part of another landfill that accepts construction debris" (PX 20).

18

the ORSF Project would require disposal of solid waste.  Walsh's bid was not rejected "for a reason not stated in the bid specifications."  *Kokosing Constr. Co.*, 72 Ohio App. 3d at 327.

Even if this Court were to conclude that the City's reading and application of the debris disposal requirement constitutes the use of "unannounced criteria," Walsh has not established that use of such criteria is "significant enough to destroy the competitive bidding process, given that all of the bidders were subject to the same criteria."  *Cleveland Constr., Inc.,* 121 Ohio App. 3d at 386.  Walsh has not shown that Kokosing had some unfair insight into the City's reading of the debris disposal requirement that Walsh lacked.  Presented with the same specification, Kokosing obtained and disclosed a commitment from a landfill that would accept both construction debris and solid waste.

### Walsh has not Established that the City Abused its Discretion in Determining use of a Construction Debris Landfill Gave Walsh a Competitive Advantage

The City and Kokosing presented evidence that, generally, tipping fees and other costs associated with the use of a sanitary landfill are higher than similar fees at a construction debris landfill (*e.g*., Harmsen Test. at 10:07; Walker Test. at 11:01).  Walsh does not challenge that general proposition.  It instead argues that the "competitive advantage" it enjoyed is legitimate, the product of a "sharp pencil," and not a basis for rejecting its bid.  Walsh also argues that it is bound by the unit price it proposed, regardless of whether deposit at Riverview would be more expensive than deposit at JEHM.

Based on the evidence, the City did not abuse its discretion in finding that a bidder that quotes debris disposal using construction debris landfill enjoys a competitive advantage over a bidder who uses a sanitary landfill.  Quoting the ORSF Project on the basis of a construction debris landfill constitutes a substantial deviation from a material specification.

19

It is not enough that Walsh claims it would be bound to deliver disposal of all materials at the JEHM-backed quote.  That would be true of any case in which a bidder on a fixed price contract obtains "low bid" status by basing a quote on materials or services that depart from an important contract specification, promising to "fix" that deviation during construction.  As the City emphasizes, the public has an interest in fair competitive bid processes, not just a bid process that yields low prices.  *See Rein Constr. Co. v. Trumbull Cty. Bd. of Comm'rs*, 138 Ohio App. 3d 622, 630 (2000).

### Kokosing's Crossclaims are Moot or Not Ripe for Review

Kokosing's crossclaims for a declaratory judgment and a writ of mandamus are denied. Having rejected Walsh's request for injunctive relief, there is no indication that the City will not now award the contract to Kokosing.

### CONCLUSION

Uncovering how the City arrived at its award in this case has been a bit like learning how sausage is made: not an encouraging or enjoyable experience.  During the post-bid period, key personnel were on vacation, City officials and consultants communicated poorly, the consultants provided the City inaccurate advice, and all parties operated under what appear to be unnecessary time pressures.  The City admits if it had acted more deliberately, the outcome might be different. Walsh is not blameless either.  It knew the City was concerned about the debris disposal bid item, claims its debris disposal quote was based on some unexplained synthesis of the JEHM and Riverview commitments, but prior to the bid award disclosed to the City only the former site.

All of these process flaws are apparent in hindsight.  What is not apparent, however, is any irrational, arbitrary, fraudulent, or bad-faith conduct on the City's part.  Because Walsh has failed to carry its heavy burden, the City's anticipated award must stand.

IT IS SO ORDERED.

 s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

October 8, 2014
